**Joseph MYERS, Plaintiff,**

v.

**The MEDICAL CENTER OF DELAWARE, INC., et al., Defendants.**

**No. Civ.A.97–461–GMS.**

United States District Court, D. Delaware.

Jan. 19, 2000.

J. Brendan O'Neill, Timothy J. Weiler, Wilmington, DE, for plaintiff Joseph Myers.

Joseph R. Slights, III, Eileen K. Anderson, Nancy W. Law, Morris, James, Hitchens & Williams, Wilmington, DE, for defendants Medical Center of Delaware, Lucia Benzoni, M.D., J.A. Nemer, M.D.

Warren B. Burt, Burt & Abrams, Wilmington, DE, for defendants Doctors for Emergency Services, P.A., Anita H. Hodson, M.D.

Stephanie D. Kinder, The New Castle County Attorney's Office, Wilmington, DE, for defendants Michelle Hinson, Domenick Gregory, Jack Gahan, John Haug, Malvern Slawter.

## AMENDED OPINION

SLEET, District Judge.

### I. INTRODUCTION

This case arises out of the tragic death of a five-year-old child, Valeria Renee Myers, and the events which followed. Although an autopsy later revealed that Valeria had died of natural causes, the doctors who first treated her suspected that she had been sexually abused. As a result, the police launched an immediate investigation into her death. However, in their zeal to solve this suspected crime, they trampled over the Fourth Amendment.

For these reasons, Joseph Myers (Valeria's father) has filed suit. Primarily, he claims that the heavy-handed tactics of the police department violated his constitutional right to be free from unreasonable searches and seizures. Myers also seeks to recover against the hospital which treated his daughter and several of its emergency room staff members because of their failure to properly diagnose the cause of Valeria's death and their resulting decision to inform the police that they believed she had been sexually abused.

All of these parties have moved for summary judgment. Myers claims that the evidence conclusively proves that three officers with the New Castle County Police Department violated his constitutional right against unreasonable searches and seizures by conducting a search of his home, and seizing items therein, upon the

authority of a search warrant issued in the absence of probable cause. These three officers (along with others) have also moved for summary judgment, asking the court to dismiss all of the claims against them. Because no reasonable officer could have concluded that the application for the offending warrant was supported by probable cause, the court will grant partial summary judgment in favor of Myers on his claims of unreasonable search and seizure. His remaining claims, however, will be dismissed because the actions of some of the officers were reasonable or otherwise undertaken in good faith. Finally, the court will grant summary judgment in favor of the medical defendants because Myers has failed to introduce competent expert testimony to establish their negligence and because, in any event, these physicians are statutorily immune from suit. The following sections discuss the bases for the court's ruling more thoroughly.

## II. STANDARD OF REVIEW.

The court can only grant summary judgment when there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. *See* Fed.R.Civ.P. 56(c) (1998). A fact is "material" if, under the governing law, it might affect the outcome of the case. *See Abraham v. Raso,* 183 F.3d 279, 287 (3d Cir. 1999) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue is "genuine" if, given the evidence, a reasonable jury could return a verdict in favor of the non-moving party. *See Cronin v. West Whiteland Tonship,* 994 F.Supp. 595, 598 (E.D.Pa.1998) (citing same). Finally, when considering the evidence submitted on summary judgment, the court must view it in the light most favorable to the non-moving party, drawing all reasonable inferences and resolving all doubts in that party's favor. *See Kornegay v. Cottingham,* 120 F.3d 392, 395 (3d Cir.1997) (quoting *Spain v. Gallegos,* 26 F.3d 439, 446 (3d Cir.1994)); *Looney v. City of Wilmington,*

723 F.Supp. 1025 (D.Del.1989). With these standards in mind, the court will now review the relevant facts giving rise to this lawsuit.

## III. BACKGROUND.

At the time that these events occurred, Myers lived in a mobile home with his wife, Phyllis, and their two children. The home itself was located in the Delaware City Trailer Park. On the morning of June 11, 1995, when Myers came home after a long night of work, he noticed that Valeria had gotten into bed with her mother. Myers, therefore, suspected that his daughter might have been sick.

During the day, as Myers slept, Valeria told her mother that she did not feel very well. When Myers awoke and prepared to return to work, Valeria was on the floor, apparently asleep. Concerned, Myers asked his wife to check on their daughter. When Phyllis bent down and touched her, she discovered that Valeria was stiff and cold. She was also not breathing.

As Phyllis called for an ambulance, Myers tried to revive his daughter. When the paramedics arrived around 6:00 P.M., they continued these efforts. Because Valeria was unresponsive, she was then transported by helicopter to the Emergency Department at the Medical Center of Delaware.

In the emergency room, as they continued the attempt to revive her, the Medical Center's staff initially assessed Valeria's condition, which was dire. Within minutes, the staff concluded that any further efforts to resuscitate her would be futile. Valeria was, therefore, pronounced dead at approximately 6:30 that evening.

### A. The Doctors Suspect Sexual Abuse.

Afterwards, several of the emergency room doctors decided that they would continue with the secondary assessment of Valeria which they had already begun. Unlike the initial or primary assessment,

which these doctors quickly completed as Valeria first entered the hospital, the secondary survey entailed a much more thorough physical examination of the child. It was primarily conducted by the emergency room residents under the supervision of one of the attending physicians.

When this examination revealed possible lacerations and swelling of Valeria's rectum and vagina, in addition to a few dark brown hairs around her labia, the doctors began to suspect that the child had been sexually abused. Other doctors were then called in for a consult. They all agreed that these symptoms were signs of possible sexual abuse.

### B. The Police Begin Their Investigation.

Around this time, Detective Michelle Hinson of the New Castle County Police Department arrived on the scene to commence an investigation into the child's death. One of the emergency room residents told Detective Hinson that Valeria had been sexually abused. As evidence of this abuse, the resident showed the detective Valeria's body, including the child's swollen anus and vagina. Corporal John Haug of the Police Department's Evidence Detection Unit was also present during this examination to document the child's condition through photographs.

At approximately 7:30 that evening, the Office of the Chief Medical Examiner was contacted. The investigator who responded to the call was apparently told by one of the hospital residents that Valeria showed "signs of sexual abuse, and there was tearing of [her] anus and vagina." Within the next fifteen minutes, Detective Jack Gahan of the Criminal Investigation Unit arrived on the scene. Upon speaking with Detective Hinson, he learned that one of the doctors had stated that Valeria had been sexually molested. Detective Gahan also got the impression that this abuse "had been ongoing over a period of time." After this conversation, Detective Gahan examined Valeria's body himself.

Although it is not clear when Myers and his wife arrived at the Medical Center, they were given an opportunity to view their daughter's body around 9:00 that night. Afterwards, they were separated by the police and taken into headquarters for questioning.

### C. The Police Obtain A Warrant And Search Myers' Home.

While Myers and his wife were being interviewed at the police station, Officer Domenick Gregory prepared a search warrant for Myers' home. The warrant itself stated that the police were conducting a "death investigation." It did not specify what crime had been committed or what statute had been violated.

In the affidavit which accompanied the warrant application, Officer Gregory stated that the police had been dispatched to the Myers residence because a five-year-old child was "not breathing." Officer Gregory continued by noting that although Valeria was taken to the Medical Center of Delaware, she "was pronounced dead a few minutes after her arrival." Officer Gregory then stated that the cause of "death . . . is unknown at this time." Although Officer Gregory was aware that the doctors had informed the police that Valeria was sexually abused, he did not include this information in the warrant application because it had not yet been verified. Finally, Officer Gregory concluded his affidavit by stating that he "hope[d the] search warrant [would] be signed to look for any signs of foul play or evidence to determine [Valeria's] cause of death."

A magistrate approved the warrant application at approximately 8:20 that evening. At the time, Corporal Malvern Slawter was standing by at the Myers residence. He was the only officer on the scene and had been told that the police were investigating the death of a five-year-old child who might have been sexually assaulted. When Corporal Slawter was informed that a search warrant had been

signed, he entered the mobile home to look for evidence of possible sexual abuse.

At approximately 10:30 that night, Corporal Slawter was joined by Corporal Haug. Corporal Haug has stated that he reviewed the warrant and accompanying affidavit before searching the trailer. Together, Corporals Slawter and Haug collected a number of pornographic video tapes and other sexual toys and devices. Some of these video tapes were apparently home made. They depicted Myers' wife engaging in sexual relations with other men. The officers also discovered a number of address cards which rated the performance of some of Phyllis' partners.

Around this time, Myers and his wife were being questioned at the police station. Detectives Hinson and Gahan were interviewing Phyllis. The other detectives were speaking with Myers. During this questioning, both Myers and his wife were repeatedly asked whether they had ever physically or sexually abused Valeria. Myers claims that he was also accused of murdering his daughter.

### D. The Police Obtain A Second Warrant.

Around 11:20 that night, Officer Gregory obtained a second search warrant from the same magistrate. This warrant was directed at, *inter alia*, a video camera which was in the trailer and the video tapes that were discovered as a result of the first search.

In support of this application, Officer Gregory noted that a previous search warrant had been issued. He also explained that a video camera and a number of pornographic video tapes had been discovered as a result of the first search. Furthermore, Officer Gregory conveyed the doctor's finding of trauma to Valeria's vagina and anus. He also stated that the police had learned that Valeria had slept in the same bed as her parents the night before and had woken up with a stomach ache. Finally, Officer Gregory requested permission to conduct a "night time search ... to

prevent [the] destruction of additional evidence prior to day time hours."

After this second warrant was issued, the police continued to search the Myers' household. It seems as if they also canvassed the neighborhood that evening, learning that pornographic materials were often strewn throughout the Myers residence. The police also heard rumors that Phyllis may have been having sex with children. This information was apparently relayed to Detectives Hinson and Gahan while they were interviewing her.

### E. Myers Is Released From Custody And The Medical Examiner Conducts An Autopsy.

At approximately 6:00 the next morning, roughly twelve hours after their daughter was taken to the emergency room, Myers and his wife were released from custody. According to Myers, during the course of his interviews, he was given two polygraph examinations. When Myers returned home, he claims that the trailer had been "torn to shreds" and "ransacked" by the police.

Later that day, the Office of Chief Medical Examiner completed its autopsy of Valeria. According to the report, "the injuries found on th[e] child's body [we]re insignificant and minor. There [wa]s no evidence of physical or sexual abuse." In fact, the coroner found "no evidence of swelling, bruising, or injury to ... the vagina" or any "evidence of swelling, hymenal bruising or tears, recent or healed lacerations, ... genital bite marks, or purulent vaginal discharge." According to the medical examiner, Valeria had suffered "sudden cardiac death and chronic cerebral hypoxia due to cardiac dysrhythmia due to [a] focal myxoid change in the proximate left bundle of the cardiac conduction system." Although the coroner's report does not distill this explanation into lay terms, it does state that Valeria died from "natural causes."

According to the coroner, the vaginal and anal swelling which the emergency room staff saw was not evidence of sexual abuse. Instead, it was actually the result of the trauma which the body normally experiences in death. It also seems that the hairs found near Valeria's vagina belonged to the family dog.

The police subsequently met with Myers and his wife to inform them of these findings. During this discussion, Myers asked them to immediately return his property. He, however, was told that it would be kept pending further investigation. It seems that Detectives Hinson and Gahan had been told to view the video tapes in order to determine whether any of them contained evidence of child pornography.

After the detectives had finished their review of these materials, they attempted to contact Myers to arrange its return. Although the parties dispute the nature of these discussions, they can agree that Myers picked up his property from the station house on August 11, 1995. He, however, claims that four constitutional law books, along with some other personal items, were missing from the inventory. The police contend that they never seized any of these books. Nor is there any record of them on the evidence log.

F. This Lawsuit.

Myers filed this suit in 1997 mainly against the doctors who erroneously concluded that Valeria had been sexually abused and the police officers who conducted an investigation into this reported abuse.

With respect to the police defendants, Myers primarily alleges that they violated his constitutional right to be free from unreasonable searches and seizures because they did not have probable cause to search his home. Myers also claims that the search itself was over broad and excessively destructive. He further seeks the return of four constitutional law books which may have been seized by the police in addition to other personal items.

As far as the medical defendants are concerned, Myers alleges that the doctors committed malpractice when they erroneously concluded that Valeria had been the victim of sexual abuse. He also claims that their employers, the Medical Center of Delaware and Doctors For Emergency Services, should be held responsible for their failure to adequately train and supervise these physicians. Myers further contends that two of these doctors slandered him by effectively implying that he abused his daughter. He also seeks to hold the Medical Center and Emergency Services liable for these allegedly tortious acts. Finally, Myers asserts a claim for the negligent infliction of emotional distress.

IV. DISCUSSION.

All of these parties have moved for summary judgment. Because no reasonable officer would have drafted and submitted the first search warrant in this case, the court will issue an interlocutory ruling which finds Officer Gregory liable for the subsequent violations of Myers' right to be free from unreasonable searches and seizures. The court will also strip him of the defense of qualified immunity. The court reaches a similar conclusion with respect to Corporal Haug. Because no reasonable officer would have relied on the first warrant which was prepared, Corporal Haug will be found liable for entering Myers' home and assisting in the search which was already under way. Furthermore, because any reasonable officer would have immediately recognized the significant risks which this warrant posed to the criminal investigation, Corporal Haug will also be held liable for failing to instruct Corporal Slawter to cease his search or, at the very least, failing to contact his superiors for additional guidance. As far as the remaining officers in this case are concerned, to the extent that their actions even give rise to a valid claim, the court finds their conduct was reasonable under the circumstances or otherwise undertaken in good

faith. Therefore, they enjoy qualified immunity from suit. Finally, the court will also grant summary judgment in favor of the medical defendants because Myers has failed to introduce competent expert testimony showing that they were negligent. The entry of summary in favor of these parties is additionally appropriate because they enjoy statutory immunity from suit. To best explain the reasons for this decision, the court will begin by discussing the cross-motions for summary judgment on the claims against the police defendants. It will then turn to an analysis of the dispositive motions filed by the medical defendants.

## A. The Police Defendants.

As previously discussed, Myers has moved for summary judgment on his claims that the police violated his rights under the Fourth and Fourteenth Amendments because they searched his home and seized his property without probable cause.[1] In so doing, Myers claims, the police deprived him of his constitutional rights while they were acting under the color of state law. *See* 42 U.S.C. § 1983 (1994). Myers also seeks to recover against Detectives Hinson and Gahan for their review of the 169 pornographic video tapes seized during this search. According to Myers, these actions violated his constitutionally protected right of privacy. Finally, Myers has moved for the replevin of the four constitutional law books which might have been seized during the search of his home. The officers have moved for summary judgment as well. They all claim that they did not violate any of Myers' constitutional rights. Furthermore, the officers contend, even if their conduct was in some way unconstitutional, their actions were reasonable under the circumstances and undertaken with a good faith belief that a crime had been committed. Therefore, they claim, they are enti-

tled to qualified immunity for their behavior.

### 1. The elements of a Section 1983 action.

In order to state a claim under Section 1983, Myers "must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *See, e.g., Barna v. City of Perth Amboy,* 42 F.3d 809, 815 (3d Cir.1994) (quoting *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988)). Here, the parties agree that the officers were acting under the color of state law at the time that these events occurred. *Cf. Daughenbaugh v. City of Tiffin,* 150 F.3d 594, 597 (6th Cir. 1998) ("Because the defendants acted in their official capacity as law enforcement officers on the day in question, they do not dispute that they were acting under the color of state law."); *accord Barry v. Fowler,* 902 F.2d 770, 772 (9th Cir.1990). They, however, disagree about whether the officers violated any of Myers' constitutional rights and, if so, whether these officers are entitled to qualified immunity for their actions. The court will address these issues in turn.

### a. Myers' rights under the Fourth and Fourteenth Amendments.

Under the Fourth Amendment, individuals enjoy the "right ... to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV. In addition, the Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized." *Id.* The protections afforded by these requirements apply to the States just as equally as they do to the federal government. *See, e.g., Mapp v. Ohio,* 367

1. In passing, the court notes that Myers has not alleged that he himself was unlawfully

seized or detained during his questioning by the police.

U.S. 643, 655–56, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (overruling *Wolf v. Colorado*, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782, (1949)).

Myers contends that the police violated these constitutionally protected rights when they searched his home and seized his property without probable cause to believe that a crime had been committed. In addition, Myers claims, the warrant itself did not describe with particularity the items that were to be seized in this case. Instead, it only contained a boiler plate list of items which Officer Gregory inserted into all of his warrant applications. Furthermore, Myers contends, the police seized items which were not identified in this previously prepared list. They, thus, exceeded the scope of their own defective warrant. The court will address these issues in turn.

### I. Probable cause.

■ A search warrant is supported by probable cause when the attached affidavit sets forth sufficient facts and circumstances to justify a reasonable belief that a search of the specified premises will uncover evidence of criminal wrongdoing. *See, e.g., United States v. Deaner*, 1 F.3d 192, 196 (3d Cir.1993) (citing *Illinois v. Gates*, 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)); *accord United States v. Pelham*, 801 F.2d 875, 877–78 (6th Cir. 1986). As the Supreme Court has repeatedly explained, this affidavit "must provide the magistrate with a substantial basis for determining the existence of probable cause." *See, e.g., United States v. Leon*, 468 U.S. 897, 915, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (citing, *inter alia, Gates*, 462 U.S. at 239, 103 S.Ct. 2317); *see also United States v. Conley*, 4 F.3d 1200, 1205 (3d Cir.1993). This basis must be a *factual* one. It cannot be founded on mere conclusory statements provided by the officer which give the magistrate virtually no basis for making an informed probable cause determination. *See Gates*, 462 U.S. at 239, 103 S.Ct. 2317.

■ While this court should not conduct its own *de novo* review of the affidavit submitted to the magistrate in order to determine whether it was supported by probable cause, *see United States v. Williams*, 3 F.3d 69, 72 (3d Cir.1993) (citing *Gates* ), neither should the court blindly approve the warrant simply because a magistrate has signed it. *See United States v. Loy*, 191 F.3d 360, 365 (3d Cir. 1999) (citing *United States v. Tehfe*, 722 F.2d 1114, 1117 (3d Cir.1983)); *United States v. Jones*, 994 F.2d 1051, 1055 (3d Cir.1993) (citing same). Instead, the court must determine whether the magistrate had a "substantial basis" for concluding that probable cause existed at the time that he signed the warrant. *See Conley*, 4 F.3d at 1205; *Williams*, 3 F.3d at 72. In making this determination, the court can only examine the information brought to the magistrate's attention in the affidavit. *See United States v. Jacobsen*, 466 U.S. 109, 112 n. 2, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984); *United States v. Singleton*, 439 F.2d 381, 384 (3d Cir.1971). The court cannot look to anything else because doing so would eviscerate the warrant requirements of the Fourth Amendment by encouraging the police to either withhold information from the magistrate as they were conducting their investigation or, even worse, attempt to justify a search by the items seized (although there was no probable cause to suspect that a crime had been committed in the first place). *See Whiteley v. Warden*, 401 U.S. 560, 564 n. 8, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971).

Delaware law is in accord. *See Wilson v. Delaware*, 314 A.2d 905, 906–07 (Del. 1973); *Pierson v. Delaware*, 338 A.2d 571, 573 (Del.1975); *Jensen v. Delaware*, 482 A.2d 105, 111 (Del.1984).

■ Here, on the face of the initial warrant, Officer Gregory stated that the crime or violation which he was investigating was the death of a five-year-old girl. His specific words were that the police were conducting a "death investigation."

In the accompanying affidavit, Officer Gregory informed the magistrate that the police had been dispatched to the Myers residence because Valeria was "not breathing." The officer also stated that the child had been taken to the Medical Center of Delaware. She, however, "was pronounced dead a few minutes after her arrival." The next paragraph of the affidavit informed the magistrate that the cause of "death ... is unknown at this time." As mentioned earlier, although Officer Gregory was aware that the doctors had informed the police that Valeria was sexually abused, he did not include this information in the warrant application because it had not yet been verified. Instead, Officer Gregory concluded his affidavit by stating that he "hope[d the] search warrant [would] be signed to look for any signs of foul play or evidence to determine [Valeria's] cause of death."

While "the issue of whether there was probable cause ... is usually a question for the jury," *see Sharrar v. Felsing*, 128 F.3d 810, 817 (3d Cir.1997), the facts surrounding the issuance of the first warrant are undisputed. Based upon these facts, the court concludes as a matter of law that the information contained within the Officer Gregory's affidavit failed to provide a substantial basis for the magistrate to conclude that there was a "fair probability that contraband or evidence of a crime w[ould] be found" at the Myers residence. *Cf. Conley*, 4 F.3d at 1205 (quoting *Gates*, 462 U.S. at 238, 103 S.Ct. 2317).

First, the very face of the warrant failed to specify that a crime had actually been committed. Instead, the warrant stated that the police were conducting a "death investigation." Dying, however, is not itself a crime, especially when it occurs from natural causes.

Second, while the circumstances surrounding a death, particularly the death of a child, may often give rise to a reasonable belief that a crime has been committed, *see, e.g., Tennessee v. Vann*, 976 S.W.2d 93, 105 (Tenn.1998), *Raigosa v. Wyoming*, 562 P.2d 1009, 1014 (Wyo.1977), Officer Gregory only informed the magistrate that Valeria was found "not breathing" and that the cause of her death was "unknown at this time." As the court just explained, these facts, standing alone, do not give rise to a reasonable belief that a crime has been committed. They only demonstrate that a child has died which, again, is not a crime.

Third, by concluding his affidavit with the statement that the police "hope[d the] search warrant [would] be signed to look for any signs of foul play or evidence to determine [Valeria's] cause of death," Officer Gregory effectively conceded that the police did not know whether a crime had been committed because they did not even know how Valeria had died.

In short, the affidavit submitted in support of the warrant merely stated that a death had occurred in the Myers' home and that the police were looking into the cause of this death. These facts, however, completely fail to provide *any* basis for suspecting that a crime had been committed. Instead, they only demonstrate that a child had died which, while tragic, is not a crime.

Admittedly, there were facts surrounding Valeria's death which would indicate that a crime might have been committed. Most notably, the doctors in the emergency room had found what they considered to be evidence of sexual abuse. *Cf. Vann*, 976 S.W.2d at 105. However, Officer Gregory withheld this information from the magistrate because it had not yet been verified.

Without any description of the condition of Valeria's body or the circumstances surrounding her death, there was no reason to suspect (let alone believe) that she had in any way been abused. In fact, Officer Gregory did not even inform the magistrate (not even in the most conclusory fashion) that the police even suspected abuse or, for that matter, any other crime.

In making this observation, the court does not mean to imply that such a statement would have justified the issuance of the warrant. *See Gates,* 462 U.S. at 239, 103 S.Ct. 2317 (cautioning that the magistrate's decision "cannot be a mere ratification of the bare conclusions of others"). On the contrary, the police would have had to provide the magistrate with sufficient *facts* to support a reasonable belief that there was evidence of criminal activity inside the Myers household. *See Conley,* 4 F.3d at 1205; *Deaner,* 1 F.3d at 196. The court is only making this observation because, in this case, the police not only failed to provide any facts to suggest that a crime had occurred, they also failed to allege in any way (whether through "mere conclusory statements" or by some other "bare bones" means)· that a crime had in fact been committed.

Because there was absolutely no basis in the warrant for believing or even suspecting that a crime had occurred, there was equally no basis to believe or suspect that evidence of this "crime" would be found in Myers' home. There was not even a "fair probability" that this evidence would be found because, by definition, without an underlying crime, there can be no evidence of criminal activity.

In light of the undisputed facts concerning the content of the first warrant affidavit, the court concludes as a matter of law that this warrant was not supported by a substantial basis for determining that there was a fair probability that evidence of a crime would be found in the Myers residence. *Cf. Conley,* 4 F.3d at 1205. Because of the facial invalidity of this warrant, Corporal Slawter violated Myers' constitutional rights when he entered the mobile home and began his search at approximately 8:30 on June 11, 1994. Corporal Haug also violated Myers' constitutional rights when he relied on this fatally defective warrant to join in this search at approximately 10:30 that same night. In other words, because their initial search of the trailer was based on a invalid warrant,

these officers violated Myers' constitutional right to be free from unreasonable searches and seizures. No reasonable jury could conclude otherwise.

The court, however, does not reach the same conclusion with respect to the second warrant. As previously discussed, although Officer Gregory obtained the initial warrant to search the Myers residence around 8:20 that evening, he obtained a second warrant roughly three· hours later from the same magistrate. Citing *Wong Sun v. United States,* Myers claims that the second warrant was based solely on the fruits of the initial illegal search (a "poisoned tree") and was, therefore, clearly unconstitutional. 371 U.S. 471, 487, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Although the exclusionary rule invoked by Myers generally applies only in the criminal context, *see Townes v. City of New York,* 176 F.3d 138, 145 (2d Cir.1999), the court understands his argument. It, however, is fundamentally flawed.

While the fruits of an illegal search can never be used to justify a warrant which was issued without probable cause, *see Whiteley,* 401 U.S. at 567 n. 11, 91 S.Ct. 1031, the inclusion of illegally seized evidence in a warrant application does not automatically render that warrant invalid, especially when the application is otherwise supported by independent probable cause. *See, e.g., United States v. Johnson,* 690 F.2d 60, 62 (3d Cir.1982) (citing *United States v. Sterling,* 369 F.2d 799, 802 (3d Cir.1966)).

■ Here, in support of the second warrant, Officer Gregory informed the magistrate that Valeria had been found in her home "not breathing." He also stated that she had been taken to the hospital but had died shortly after her arrival. Officer Gregory then stated that the doctor who had examined Valeria advised the police that "the victim had trauma to the vaginal and anal area." The officer continued by noting that, through "interviews with the victim's mother," the police learned that Valeria, "at some point in time during the

night, got into bed with [Phyllis] in the master bedroom." During this interview, Officer Gregory explained, Valeria's mother also stated that after Myers had returned home from work, he "go into bed [with] the victim, who was still sleeping." Approximately thirty minutes later, the officer informed the magistrate, "the victim came out of the bed room complaining of stomach pains."

Although the doctor's diagnosis later turned out to be incorrect, there can be no question that the information provided to the magistrate at the time that he approved the second warrant gave him a substantial basis to conclude that the crime of child abuse had been committed and that there was a fair probability that evidence of this crime would be located in the Myers household. *See Conley*, 4 F.3d at 1205; *Williams*, 3 F.3d at 72; *Deaner*, 1 F.3d at 195; *cf. Vann*, 976 S.W.2d at 105.

While Myers complains that the affidavit in support of this second warrant also stated that, during their initial search, the police "located a video camera … in the master bedroom and numerous video tapes," the court fails to see how this information could vitiate an otherwise valid warrant. *See Johnson*, 690 F.2d at 62; *Sterling*, 369 F.2d at 802. The warrant application itself states that, after interviewing Valeria's mother, the police learned that, a few hours before she was rushed to the hospital, the child had been in bed alone with her father. When she awoke, she complained of stomach pains. The doctors at the hospital subsequently confirmed what they believed to have been evidence of sexual trauma. None of this information was gleaned from the search of Myers' home. Consequently, it serves as an independent basis for probable cause which validates the issuance of the warrant. *See Johnson*, 690 F.2d at 62 ("When the allegedly unlawful evidence … is set aside, [the affidavit] still contains ample information to justify the … finding [of] probable cause."); *Sterling*, 369 F.2d at 802 ("Here, the evidence sufficient to sup-port 'probable cause' was not procured as a result of the allegedly illegal activity and, thus, could not be said to be the fruit of a poisoned tree."). Nevertheless, there is still a question of whether the "allegedly improper material in the affidavit [might] have affected the scope of the warrant issued." *See Sterling*, 369 F.2d at 802. This question, however, relates to whether the second warrant was itself so over broad that it amounted to a general warrant, which is impermissible under the Constitution. Because Myers makes this same claim concerning the first warrant, the court will address his arguments in the following section.

### ii. General warrant.

■ A general warrant is one that authorizes a "general exploratory search through a person's belongings" without specifying the particular items to be seized. *See United States v. Christine*, 687 F.2d 749, 752–53 (3d Cir.1982) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 467, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971)). The Fourth Amendment seeks to prevent these types of wide-ranging searches because they are an unreasonable and unwarranted intrusion into a person's privacy. *See Horton v. California*, 496 U.S. 128, 141, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). As the Third Circuit explained in *Christine*, by "requiring all warrants to contain a 'particular description' of the things to be seized," the Fourth Amendment "makes general searches … impossible and prevents the seizure of one thing under a warrant describing another." 687 F.2d at 752–53 (quoting *Marron v. United States*, 275 U.S. 192, 196, 48 S.Ct. 74, 72 L.Ed. 231 (1927)). The State of Delaware has recognized and codified these legal principles. *See In re Brookview Assocs.*, 506 A.2d 569, 571 (Del.Super.Ct.1986) (citing Del.Code Ann. tit. 11, §§ 2306–07 (1998)). In fact, as Section 2307 specifically provides, the "warrant shall designate the house, place, conveyance, or person to be searched and shall describe the things

In the affidavit which accompanied his application for the first warrant, Officer Gregory stated that the cause of Valeria's death was "unknown at this time." Therefore, he "hope[d that the] search warrant [would] be signed [so that the police could] look for any signs of foul play or evidence to determine[ the] cause of death." The warrant itself describes this evidence as:

Any signs or tools to facilitate entry, photographs and video tape of the crime scene, fingerprint[ ] processing, vacuum sweepings to detect hair and fibers belonging to the victim or suspect, blood samples, any signs of a struggle, ... weapons used to commit the crime, [and] any written documents which may portray a motive or lead to the identification or whereabouts of the perpetrator.

It seems that this list of items was standard "boiler plate" language that Officer Gregory had pre-printed on several blank search warrants. At his deposition, the officer effectively admitted that he includes this "laundry list" of materials in almost every warrant application, no matter what the crime, because this type of information would enable the police to launch an investigation into virtually any type of crime.

While undoubtedly efficient, the court finds this practice somewhat troubling mainly because the tactic seems to violate the spirit, albeit not the exact letter, of the Fourth Amendment by enabling the police to generate a generic list of desired evidence well in advance of any specific crime being committed. Thus, any subsequent search to locate the items identified in this list could be seen as a "fishing expedition" because, at the time that the list itself was generated, the police had no knowledge of the facts or circumstances surrounding the particular crime that they were now investigating.

Nevertheless, because the initial warrant specifically referred to Officer Gregory's affidavit, its description of the items to be seized must be viewed in light of the facts that were made available to the magistrate at the time. *See United States v. Johnson,* 690 F.2d 60, 64 (3d Cir.1982). When this warrant and its accompanying affidavit are read together, it becomes clear that the police had only been authorized to process the scene and collect any "written document which may portray a motive or lead to the identification ... of the perpetrator" or any weapons which might have been "used to commit the crime." Given this level of specificity, the court concludes as a matter of law that the first warrant was not a general one, at least not on its face, even though it was not supported by probable cause. There, however, remains a question of whether Corporals Slawter and Haug exceeded the scope of this warrant by seizing evidence which had not been identified in it.

In executing the first warrant, these officers seized several sheets, blankets, and pillow cases. They also took a video tape of the scene and collected seven vacuum samples of different areas around the home. Finally, pursuant to the warrant, they seized a number of binders containing medical records and two boxes of address cards. All of these activities were expressly authorized by the warrant.

However, in the course of their search, these officers also uncovered and seized numerous pornographic video tapes (several of which were apparently home made). The officers also seized a number of sexual toys and devices in addition to several roles of film and still photographs.

Although the warrant itself did not specify these items, nor in any other way suggested that Valeria was the victim of sexual abuse, Corporal Slawter apparently seized these items because he had been told that by his superiors that Valeria had been abused. Corporal Haug seized these materials for essentially the same reason. After reviewing the first warrant in light

of his knowledge about the case, he believed that they might bear on the issue of whether Valeria had been sexually abused.

As several circuit courts have explained,

Where evidence is uncovered during a search pursuant to a warrant, the threshold question must be whether the search was confined to the warrant's terms.... "The search must be one directed in good faith toward the objects specified in the warrant or for other means and instrumentalities by which the crime charged had been committed. It must not be a general exploratory search."

See *United States v. Rettig*, 589 F.2d 418 (9th Cir.1978) (quoting *Gurleski v. United States*, 405 F.2d 253, 258 (5th Cir.1968)).

Even when the court puts aside the fatal deficiencies of the first warrant, it still cannot ignore the fact that Officer Slawter and Corporal Haug exceeded the scope of the search which had been authorized by the magistrate by seizing evidence which had not been specified in the warrant. The officers, in other words, were engaging in the very type of "general exploratory rummaging" which the Constitution forbids. See *Christine*, 687 F.2d at 752. In fact, in conducting their search, the officers "substantially exceeded any reasonable interpretation of [the warrant's] provisions." See *Rettig*, 589 F.2d at 423. As a result, the warrant "became and instrument for conducting a general search." *Id.*

By way of illustration, although the warrant authorized the officers to take "photographs and video tape *of* the crime scene," it did not authorize them to take photographs and video tapes which belonged to Myers *from* the crime scene. Moreover, while the officers may have been justified in removing "any written documents which may portray a motive or lead to the identification ... of the perpetrator," video tapes and photographs do not fall within a reasonable definition of this category of materials.

In short, these officers turned a warrant which authorized an investigation into the death of a child into a *carte blanche* to seize evidence of not necessarily illegal but, instead, immoral acts. While the seizure of these items *might* have been justified if the magistrate had been more fully informed of the circumstances surrounding Valeria's death, *cf. Rettig*, 589 F.2d at 423, this information had been deliberately withheld by Officer Gregory because it had not been verified. Therefore, the court concludes as a matter of law on these undisputed facts that Corporals Slawter and Haug converted the first warrant into an instrument for conducting a general search in violation of Myers' rights under the Fourth and Fourteenth Amendments.

 The court, however, does not reach the same conclusion with respect to the search conducted pursuant to the second warrant. As previously discussed, this warrant was supported by a substantial basis to believe that the crime of child abuse had been committed and that there was a fair probability that evidence of this crime would be located in the Myers household. *Cf. Conley*, 4 F.3d at 1205; *Williams*, 3 F.3d at 72; *Deaner*, 1 F.3d at 195. Moreover, this basis was independent of any of the evidence seized during the first search because it was based on information that Phyllis had provided the police during her questioning and the doctors conclusions that Valeria had suffered trauma to her anus and vagina. *Cf. Johnson*, 690 F.2d at 62; *Sterling*, 369 F.2d at 802. Furthermore, the warrant specifically identifies the "video camera and video tapes located in the master bedroom" as items to be seized. Thus, on its face, the second warrant was not so over broad as to constitute a general warrant. See *Johnson*, 690 F.2d at 64. In addition, because the police seized only this particular video camera and one video tape under this warrant, it was not converted into an instrument for conducting a general search. See *Rettig*, 589 F.2d at 423. Consequently, the police did not violate any of Myers' consti-

tutional rights when they conducted this second search and seized the selected items during it.

### iii. Good faith.

Citing *Malley v. Briggs*, Officer Gregory as well as Corporals Slawter and Haug contend that they were acting in good faith as they engaged in their activities. Thus, they claim that they are entitled to qualified immunity. 475 U.S. 335, 344–45, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1982) (relying on *Leon*, 468 U.S. at 923, 104 S.Ct. 3405). The court, however, is not entirely persuaded. Most notably, there is an exception to the "good faith" rule when a warrant is "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid" or the affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *See, e.g., Loy*, 191 F.3d at 367 (quoting *Leon*, 468 U.S. at 928, 104 S.Ct. 3405). As the preceding discussion should make clear, the first warrant issued in this case was so facially deficient and its accompanying affidavit was so utterly lacking in probable cause that no reasonable officer could have relied on them.[2]

Because Officer Gregory prepared this affidavit and obtained the warrant and because even the most cursory review of the facts contained within this affidavit could not have led any reasonable officer to conclude that it set forth a substantial basis for believing that a crime had been committed or that there might be a fair possibility of locating evidence pertaining to this "crime" in the Myers household, he cannot legitimately claim that he was acting in good faith when he made out the warrant application. Furthermore, because Corporal Haug reviewed both the

warrant and the attached affidavit prior to arriving at the Myers residence to assist in the search which was already under way, he also cannot claim that he was acting in good faith when he entered the Myers residence.

Corporal Slawter, on the other hand, was acting in good faith when he began his search. Unlike the other two officers, Corporal Slawter had been dispatched to the scene by his superior officers and told to secure it until the warrant was issued. When he was informed that the magistrate had signed the warrant, he commenced his search. He did not have a copy of the warrant at the time because his instructions came over the radio. Thus, he had no idea of the contents of the affidavit. Furthermore, at the time that he began his search, Corporal Slawter had been told that Valeria may have been sexually assaulted. Thus, his decision to seize the pornographic videos and other items which he found was not unreasonable, especially since many of them seem to have been in plain sight. *Cf. United States v. Soussi*, 29 F.3d 565, 571 (10th Cir.1994) (citing *United States v. George*, 975 F.2d 72, 79 (2d Cir.1992); *United States v. Holzman*, 871 F.2d 1496, 1513 (9th Cir.1989); *United States v. Fitzgerald*, 724 F.2d 633, 637 (8th Cir.1983)). Although these items are not themselves illegal, they were relevant to the crime which Corporal Slawter believed had been committed. Consequently, his decision to seize them was objectively reasonable.

In light of this discussion, it should come as no surprise that the court finds that Corporal Slawter enjoys qualified immunity for all of his activities during the search. However, Officer Gregory may not assert a qualified immunity defense at trial be-

---

**2.** In making this statement, the court is not saying that probable cause did not exist to search the Myers home. As previously explained, all of the officers were in possession of sufficient information to support a reasonable belief that a crime had, in fact, been committed. Specifically, these officers were

aware that the doctors suspected that Valeria had been sexually abused. However, this crucial information was omitted from the first warrant application. As the court will discuss, this omission rendered the warrant facially invalid and made any reliance on the document fundamentally unreasonable.

cause, as a matter of law, his actions were objectively unreasonable. In short, no reasonable officer would have submitted the first warrant to the magistrate because it was utterly devoid of any indicia of probable cause. For this same reason, Corporal Haug does not enjoy qualified immunity for his decision to enter the Myers home and begin searching or for his failure to stop the search which was already in progress. The following section discusses these issues in greater detail.

iv. Qualified immunity.

As government officials who were performing discretionary functions when they searched Myers' home, these three officers are entitled qualified immunity for their actions as long as their conduct did not violate a clearly established constitutional right of which a reasonable person would have known. *See, e.g., Sharrar,* 128 F.3d at 826 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)); *Kornegay,* 120 F.3d at 395 (citing *Shea v. Smith,* 966 F.2d 127, 130 (3d Cir.1992)). Where, as here, a plaintiff brings an action under Section 1983 alleging that the police violated his Fourth and Fourteenth Amendment rights, this inquiry focuses on "whether a reasonable officer could have believed that his ... conduct was lawful, in light of clearly established law and the information in the officer's possession." *See Sharrar,* 128 F.3d at 826 (citing *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991); *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). As the Third Circuit explained in *Sharrar,* this standard ensures that

> law enforcement officers who "reasonably but mistakenly" conclude that their conduct comports with the requirements of the Fourth Amendment [will receive] immunity. In this way, "the qualified immunity standard 'gives ample room for mistaken judgments' by protecting

'all but the plainly incompetent or those who knowingly violate the law.'"

*Id.* (quoting *Hunter,* 502 U.S. at 227, 229, 112 S.Ct. 534) (other citations omitted).

Although the officers contend that the law in this area was not "clearly established" at the time they searched Myers' home because there were "no cases directly on point with [the] circumstances" in these proceedings, the court finds it extremely difficult to take this contention seriously. The State of Delaware ratified the Constitution and the Bill of Rights on December 6, 1789—over two hundred years ago. The Fourth Amendment clearly provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized." U.S. Const. amend. IV. This amendment was first made binding on the States over forty years ago. *See Mapp,* 367 U.S. at 655–56, 81 S.Ct. 1684. Thus, in 1995, it was well established that police officers needed a warrant to enter a suspect's home to conduct a search and that this warrant had to be supported by probable cause while identifying the items to be seized with particularity. *See, e.g.,* DelCode Ann. tit. 11, § 2607. It was also well established that, in the absence of exigent circumstances, the police were not entitled to enter a house without a valid warrant. *See, e.g., United States v. Velasquez,* 626 F.2d 314, 318 (3d Cir.1980) (citing *United States v. Rubin,* 474 F.2d 262, 268–69 (3d Cir.1973)); *Delaware v. Hedley,* 593 A.2d 576, 581–83 (Del.Super.Ct.1990) (relying on, *inter alia, Patrick v. Delaware,* 227 A.2d 486, 489 (Del.1967)). Therefore, the court turns to the issue of whether a reasonable officer could have believed that the activities of these policemen were lawful in light of clearly established law and the information that they possessed at the time. *See Sharrar,* 128 F.3d at 826.

Prior to entering the Myers residence, Corporal Slawter was told that, inside, a five-year-old child had died earlier

that day and that the doctors suspected that she had been sexually abused. Thus, when this officer was informed that the police had obtained a warrant and that he should commence his search, his activities were not unreasonable. For the same reason, his decision to seize pornographic materials and other sexual toys, which were apparently in plain view, was also not unreasonable.

 However, unlike Corporal Slawter, Corporal Haug had an opportunity to review the warrant prior to entering the Myers household. Any reasonable officer taking even the most cursory glance at the document would have realized that it was utterly lacking in any cause to justify a search. Even though Corporal Haug possessed additional information which was not contained in Officer Gregory's affidavit but which would have given probable cause to search, it was not objectively reasonable for him to enter the mobile home. Corporal Slawter had already secured the area and, in fact, was in the process of searching the trailer. Furthermore, Valeria had already died, and her parents (who were apparently the two main suspects) were being questioned at police headquarters. Thus, Corporal Haug had no justifiable reason to enter the Myers home and assist officer Slawter in the search.

In fact, under these circumstances, any reasonable officer in Corporal Haug's position should have either called Corporal Slawter out of the trailer, telling him to cease his search or, at a minimum, contacted his superiors to request further guidance. A reasonable officer would have done so if for no other reason than to preserve the integrity of the criminal investigation. In short, given the obvious deficiencies of this warrant, any reasonable officer should have at least suspected that the evidence seized under it might be suppressed, especially since the attending circumstances did not otherwise justify entry into the mobile home. Consequently, the

failure to take appropriate steps to stop the search was not objectively reasonable.

 Finally, in light of the "plain incompetence" surrounding the manner in which Officer Gregory prepared the first warrant application, *see Sharrar*, 128 F.3d at 826 (citing *Hunter*, 502 U.S. at 229, 112 S.Ct. 534), the court holds as a matter of law that he may not assert a qualified immunity defense at trial. In fact, given the undisputed facts, the court will enter an interlocutory ruling of liability against Officer Gregory for his role in procuring a warrant which was so completely devoid of any indicia of probable cause that no reasonable officer would have submitted it and, thus, facilitating an illegal search of Myers' home. *See* Fed.R.Civ.P. 56(c). For this same reason, the court finds that Corporal Haug is liable for not only his failure to stop Corporal Slawter from continuing his search but also his decision to enter the Myers home and assist in the search which was already under way.

In light of this holding, the court concludes that a reasonable jury could find that Officer Gregory acted with "reckless or callous indifference" for the federally protected rights of others when he drafted the defective warrant application. *See Robinson v. Clemons*, 987 F.Supp. 280, 288–89 (D.Del.1998) (quoting *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983)). Therefore, his motion for summary judgment on Myers' punitive damages claim will be denied. The court will also deny Corporal Haug's motion on the same claims because a reasonable jury could likewise conclude that he showed the same level of indifference when he not only failed to stop the search which was already in progress but also entered the Myers residence, after reviewing this facially defective warrant, to assist in this search. However, given the reasonableness of Corporal Slawter's actions under the circumstances, his motion will be granted.[3]

---

**3.** To the extent that Myers is attempting to recover against Detectives Hinson and Gahan

In reaching these conclusions, the court has not ignored the argument that the conduct of the police defendants should be viewed in light of all the information that they possessed at the time. *See United States v. Martin,* 833 F.2d 752, 755–56 (8th Cir.1987) ("Although we may not look to facts outside of the affidavit to determine probable cause, when assessing good faith, we can and must look to the totality of the circumstances including what [the officer] knew but did not include in his affidavit.") (citing *Whiteley,* 401 U.S. at 565 n. 8, 91 S.Ct. 1031; *Anderson,* 483 U.S. at 637, 107 S.Ct. 3034). Instead, it is the adoption of this very argument which leads to the conclusion that Officer Gregory and Corporal Haug must be held liable for their actions.

As the court has explained, no reasonable officer should have even considered submitting the first warrant application for approval because it completely lacked any basis for believing that a crime had been committed in the Myers home. In fact, as the court has pointed out, the affidavit in support of this application did not even state that the police suspected criminal activity. Instead, it simply stated that the police did not know what caused Valeria's death and that they were "hop[ing] . . . to look for any signs of foul play or evidence to determine [this] cause. . . ."

Thus, although it is not entirely clear whether Officer Gregory was instructed to exclude the preliminary findings of sexual abuse from the first warrant application or to withhold the warrant application until these findings had been confirmed, this uncertainty does not change the court's decision.

If Officer Gregory had been under orders to confirm the sexual abuse before submitting the warrant application, then he clearly disobeyed these orders, adding to the unreasonableness of his actions. If, on the other hand, Officer Gregory had been ordered to exclude this information from the first warrant application, then these orders were clearly unreasonable since they would have rendered that application facially deficient.[4] As a result, it would have been unreasonable for any officer to have followed these instructions. Moreover, any reasonably well trained officer (acting reasonably) who had received these directions would have immediately pointed out the obvious deficiencies created by the omission of this information. If nothing else, this officer would have recommended that a prosecuting attorney be contacted to review the document before it was submitted to a magistrate in order to ensure that the application was supported by probable cause.[5]

for the search of his home, these claims are dismissed since there is no evidence that these two officers participated in or, in any other way, facilitated this search.

4. In passing, the court notes that Myers did not bring suit against the superior officer who seems to have issued the order which Officer Gregory claims to have followed.

5. While the police officers may contend that these requirements place too great a burden on them, the court believes differently. If the burden is onerous, and if it falls anywhere, it would seem to be upon the shoulders of the "neutral" magistrate which is not where the burden should be. The magistrate's job is to conduct a review of the application with a detached eye. He is not counselor to the police. That is a role reserved and best served by the prosecutor in our constitutional system which contemplates the existence of

checks along the way. These checks are designed to protect us from just the type of intrusion that took place in the instant case. If it is true that no prosecutor was available to review the application, either because the assigned attorney was unavailable or because there was no system of prosecutive review in place at the time, neither situation excuses the officers' actions under the circumstances of this case. As previously discussed, there were no exigencies. The police had already secured the scene and had the individuals who were the focus of their investigation effectively in police custody. Thus, there should have been no concern that evidence might be lost or destroyed or that the prime suspect or suspects might flee during the time that it would have taken to properly comply with the requirements of the Fourth Amendment.

Furthermore, by the time that he had arrived on the scene, Corporal Haug had already reviewed the first search warrant and its supporting affidavit. As the court has found, no reasonable officer could have concluded that the information set forth in these documents provided any basis for believing that a crime had been committed or that any evidence of this crime might be located in the Myers household.

Thus, while both of these police officers ask the court to excuse their conduct because they were personally aware of facts which would have otherwise justified their actions, their subjective beliefs are not relevant to the court's analysis. *See Malley*, 475 U.S. at 342–44, 106 S.Ct. 1092. As the Supreme Court has held,

> the same standard of *objective* reasonableness ... applied in the context of a suppression hearing ... defines the qualified immunity accorded an officer whose request for a warrant allegedly caused an unconstitutional [search].

*See Malley* 475 U.S. at 344–45, 106 S.Ct. 1092 (citing *Leon*, 468 U.S. at 923, 104 S.Ct. 3405) (emphasis added).

The *Malley* Court adopted this test in an attempt to encourage officers to reflect upon their affidavits and whether they set forth a sufficient basis for probable cause *before* submitting them in support of a warrant. *Id.* at 343, 106 S.Ct. 1092. This moment of reflection was intended to reduce the number of "premature" warrant applications. As the Court explained, "[p]remature requests for warrants are at best a waste of judicial resources; at worst, they lead to premature arrests [or searches], which may injure the innocent or, by giving the basis for a suppression motion, benefit the guilty." *Id.* at 343–44, 106 S.Ct. 1092.

Here, because Officer Gregory's first warrant application was premature and because Corporal Haug improperly acted on the premature warrant which followed, a person who had done nothing wrong (Myers) was injured. A ruling which now holds these two officers directly responsi-ble for his injuries is entirely consistent with *Malley*. *Id.* at 344, 106 S.Ct. 1092 (citing *Owen v. City of Independence*, 445 U.S. 622, 653, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980)). In fact, as the *Malley* Court implicitly recognized, while an individual like Myers may find some solace in the fact that he was never prosecuted for a crime which was not committed, the more appropriate remedy is to hold the officers whose unreasonable conduct led to the constitutional violation liable for their actions. *Id.*

As the Supreme Court explained, "where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable ... the shield of immunity [will] be lost." *Id.* at 345, 106 S.Ct. 1092. As this court has held, the first warrant application submitted by Officer Gregory and relied upon by Corporal Haug was "so lacking." Consequently, these officers are not entitled to assert a defense of qualified immunity.

In fact, if the court were to grant these officers qualified immunity in this case, its ruling would only serve endorse their conduct. As a result, the police would be encouraged to submit facially defective warrant applications which provide no basis for probable cause in the hopes that a magistrate would simply "rubber stamp" the request. Then, the police could later claim that they were relying in good faith on the magistrate's "independent" probable cause determination when the search or seizure was challenged. The police would also be encouraged to act only on their subjective beliefs about a case without considering the language of or possibly even the need for any accompanying warrant.

However, as the Supreme Court has made clear, it is in these very instances when the *good faith exception does not apply* because the actions of the officers are not *objectively* reasonable. *See Malley*, 475 U.S. at 344–45, 106 S.Ct. 1092

(relying on *Leon,* 468 U.S. at 923, 104 S.Ct. 3405). In fact, if Officer Gregory and Corporal Haug could justify their conduct by pointing to only the reasonableness of their subjective beliefs, then all of the protections guaranteed by the Fourth Amendment would effectively evaporate. *See Leon,* 468 U.S. at 915 n. 13, 104 S.Ct. 3405. The police would not even require warrants any longer because, in their opinion, the information in their possession (whatever information that might be) would literally "warrant" their activity. Consequently, all searches and seizures would be left to police discretion, which is exactly what the Fourth Amendment was intended to prevent. *See id.* (citing *Beck v. Ohio,* 379 U.S. 89, 97, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964)). Even worse, the police could begin to justify their searches based on the evidence which they seized from the home instead of the evidence which they suspected was there. *Cf. Henry v. United States,* 361 U.S. 98, 104, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959) (cited in *Beck* and *Leon*). Thus, the police could effectively act in complete ignorance or derogation of the law without fearing reprisal, which is a result that the Supreme Court never intended. *See Leon,* 468 U.S. at 919–20 n. 20, 104 S.Ct. 3405.

For all of these reasons, the defense of qualified immunity is not available to either Officer Gregory or Corporal Haug, and these officers will be held liable for their conduct.

b. The excessive use of force used to execute this search.

■■■ Myers also contends that Corporals Slawter and Haug used excessive force when they conducted their search because, when he returned home after being questioned by the police, his trailer had been "ransacked" and "torn to shreds." However, on this point, Myers provides nothing more that unsubstantiated allegations, which are insufficient to survive a motion for summary judgment. *See Coolspring Stone Supply, Inc. v. American States Life Ins. Co.,* 10 F.3d

144, 148 (3d Cir.1993); *Tilden Fin. Corp. v. Palo Tire Serv., Inc.,* 596 F.2d 604, 607 (3d Cir.1979). In fact, with one exception, Myers has completely failed to document any of the items of property which were purportedly damaged or destroyed by the police during this search. Furthermore, the uncontroverted record evidence demonstrates that this item, a guitar, was "not broken and appeared to be in working condition" when the police concluded their search. Therefore, to the extent that Myers is attempting to recover on this claim, summary judgment will be granted in favor of the police defendants.

c. Myers' right of privacy.

■■■ Myers next claims that his right of privacy was violated when Detectives Hinson and Gahan retained the 169 pornographic video tapes which had been confiscated during the search of his residence and subsequently viewed them over a two-week period. According to Myers, by that time, the police had already determined that Valeria had died of natural causes. As a result, he contends, they had no reason to keep these materials since their investigation was closed.

However, during their canvass of the neighborhood on the night that his mobile home was searched, the police were informed by several residents that Myers' wife was having sex with children. While needing to proceed carefully, given the unfortunate frequency of this type of report today, the authorities would have been loath to summarily dismiss such allegations. Furthermore, at the time that the police received this information, they had in their possession (pursuant to the second, valid warrant) almost two hundred pornographic video tapes, several of which were home made, in addition to numerous other sex toys and devices. Consequently, the decision to review these materials in order to determine whether they in any way involved child pornography was not improper. Furthermore, this decision was made by the detectives' superior, not the

detectives themselves. Because the order itself was not objectively unreasonable, the decision of Detectives Hinson and Gahan to follow it cannot possibly serve as a basis for the imposition of liability under Section 1983. *Cf. Vela v. White,* 703 F.2d 147, 152 (5th Cir.1983) (holding that an arresting officer could not be held liable for following the instructions of his superior because "it would not be fair to [the officer] to either violate a direct order or stop and interrogate [his superior] as to the reasons for his order"). Therefore, the court will grant summary judgment in favor of the police defendants on this claim.

### 2. Replevin.

Finally, Myers seeks compensation for or the return of four constitutional law books, in addition to some other personal items, which may have seized during the search of his residence.

 Under Delaware law, once a suspect is acquitted of criminal charges, the county no longer has any right to hold the items which were seized during the investigation. *See Walls v. Rees,* 569 A.2d 1161, 1164–65 (1990). Thus, such a person may maintain an action for replevin of this property. *See* Del.Code Ann. tit. 10, § 3905 (1998). In order to successfully recover in replevin, the plaintiff must show that he has title or the right to possess the materials at issue.

 Here, Myers has failed to adduce this evidence. Although he claims that his four constitutional law books were never returned to him, there is no evidence that they were ever seized. Although Myers alleges differently in his complaint, he has failed to submit any evidence which would enable a reasonable jury to return a verdict in his favor on this issue. Furthermore, the complaint itself contains only the most general description of these items, identifying them as "books, papers, and letters." Without more, he cannot defeat the police defendants' motion for summary judgment.

### B. The Medical Defendants.

The physicians who treated Valeria when she was first brought into the emergency room, as well as their employers, have also moved for summary judgment. In their papers, these defendants argue that Myers has failed to present competent expert testimony which would enable a reasonable jury to conclude that they were negligent in failing to properly diagnose the cause of Valeria's death. Furthermore, these defendants claim, even if Myers had adduced this evidence, they are entitled to statutory immunity for their actions. The court agrees and will, therefore, grant summary judgment in their favor.

### 1. Medical negligence.

 In order to demonstrate that the doctors in this case were negligent when they misdiagnosed the cause of Valeria's death, Myers must establish that they "deviat[ed] from the applicable standard of care in the specific circumstances of th[is] case...." *See* Del.Code Ann. tit. 18, § 6853 (1998). In order to make this showing, Myers must introduce "expert medical testimony" by a person who is "familiar with the degree of skill and care ordinarily employed in the field of medicine [about] which ... she will testify." *See* Del.Code Ann. tit. 18, § 6854 (1998).

Myers claims that he has complied with these requirements by proffering the testimony of Adrienne Sekula–Perlman, M.D. Dr. Sekula–Perlman is an assistant medical examiner with the state coroner's officer. She was the one who conducted the autopsy of Valeria's body. According to Dr. Sekula–Perlman, the second that Valeria died, the emergency room physicians should have stopped treating the child and abandoned their more thorough secondary examination of her physical condition because the matter was now one for a pathologist. Thus, in Dr. Sekula–Perlman's view, the doctors in the emergency room were actually conducting pathology when

they misdiagnosed the cause of Valeria's death, not emergency medicine.

Thus, at first glance, it seems that Myers has satisfied the relevant statutory criteria for establishing his case of medical negligence. Dr. Sekula–Perlman is, after all, familiar with the standard of care employed by pathologists. However, the Delaware courts have imposed a secondary requirement on the nature of this expert testimony. Specifically, it must be offered by a professional who is in the same field of medicine as the defendant because a "practitioner of one school of medicine is [generally] not competent to testify against a practitioner of another school of medicine" unless the methods used by the two schools overlap. *See Hurley v. Medical Ctr. of Delaware, Inc.*, 1988 WL 130399, at *1 (Del.Super.Ct. Nov.28, 1988) (citing *Sheppard v. Firth*, 215 Or. 268, 334 P.2d 190, 192 (1959)).

Here, Dr. Sekula–Perlman has admitted that she is neither trained nor certified in emergency medicine. Furthermore, she has stated that there is no overlap between the two fields because the death of the patient automatically separates the two.

■ The medical defendants, however, have introduced the testimony of Cynthia Christian, M.D., who is board certified in emergency medicine and specializes in the care of children. According to Dr. Christian, "a physician who is presented with a child who dies in the emergency room would always complete the physical examination of their patient," including the secondary survey, in order to determine whether any conclusions could be reached "about the cause of death, regardless of whether it [resulted from] child abuse and neglect or gangrene . . . ."

Frances Speidel, M.D., another one of the defendants' experts who is similarly trained and certified, has expressed the same conclusions. In fact, Dr. Speidel has testified that if the emergency room physicians had declined to perform this type of thorough physical examination af-

ter Valeria had been declared dead, they would have breached the governing standard of care. According to Dr. Speidel, this is so because, whenever a child dies under suspicious circumstances, the treating physicians should "do the best they can to record what they have seen . . . and to present it to people who can investigate it."

Given this record, the court concludes that it is appropriate to grant summary judgment in favor of the medical defendants. Although there is a certain degree of logical appeal to the standard articulated by Dr. Sekula–Perlman, experts in the field of emergency medicine have essentially testified that such a "bright line" rule is fundamentally unworkable because of the nature of the injuries which arrive at emergency rooms in addition to the pressures and duties on the doctors who treat them. In other words, although the court has no doubt that Dr. Sekula–Perlman is eminently qualified to opine on issues of forensic pathology, she is not qualified to testify regarding the standards of care applicable to emergency room physicians, especially those who treat children. Because Myers offers no other expert testimony in support of his claims of medical negligence, the court will grant summary judgment in favor of the defendants on these claims as well those concerning the failure of the Medical Center of Delaware and Doctors for Emergency Services to adequately train and supervise their staff.

2. Privilege.

■ Even if the testimony of Dr. Sekula–Perlman conclusively established that the emergency room physicians violated the governing standard care, the court would still conclude as a matter of law that these doctors and their employers are immune from suit because they were engaging in a statutorily protected activity. *See* Del.Code Ann. tit. 16, § 908 (1998).

Admittedly, it does not seem as if the physicians complied with all of the requirements of this statute. For example, while

a report of suspected child abuse was made, it does not appear to have been made to Child Protective Services, *see* Del. Code Ann. tit. 16, § 904 (1998), at least not when the record is viewed in the light most favorable to Myers. Nevertheless, the court does not believe that this failure proves fatal to the defense.

The Child Abuse Prevention Act was adopted for the express purpose of "ensur[ing] the best interest and safety of the child...." *See* Del.Code Ann. tit. 16, § 901 (1998). Toward this end, the Act "mandat[es] that reports of ... abuse or neglect be made to the appropriate authorities...." *Id.* Individuals who, in good faith, provide this report are statutorily immune from the imposition of both civil or criminal liability. *See* Del.Code Ann. tit. 16, § 908.

Here, a five-year-old child arrived in the emergency room with what appeared to be severe trauma to her anus and vagina. The police were also on the scene, beginning their investigation into the matter. Under these circumstances, it was not unreasonable for the emergency room residents or their attending physicians to report their suspicions to the police. Indeed, they may have even been mandated to do so. *Cf.* Del.Code Ann. tit. 11, § 1241 (1998). Whatever the case, it is clear that they were acting in what they considered to be the best interest of the child. There is no evidence to the contrary.

Thus, even though these physicians turned out to be mistaken, their error was a reasonable one made in good faith. In light of these facts, their failure to follow the exact letter of the statute, *see* Del. Code Ann. tit. 16, § 904, should not strip them of the immunity which the legislature intended to confer. Any other decision would undermine the purpose of the statute by discouraging doctors from coming forward when they suspect possible child abuse.

In light of this holding, Myers' claim for punitive damages against the medical defendants also fails as a matter of law. *See*

*also* Del.Code Ann. tit. 18, § 655 (1998) (requiring evidence of "malicious intent" or some other "willful or wanton misconduct" in order to support an award for punitive damages).

### 3. Slander.

Finally, to the extent that this ruling fails to dispose of Myers' claim that these doctors slandered him by informing the police that Valeria had been sexually abused and, thus, implying that he was the perpetrator, the court notes that no doctor ever identified Myers by name. Nor did any physician state that "it was probably the father who did it" or tell the police that they "might want to talk to the dad." Thus, there is no evidence that the comments made by the emergency room staff were "of and concerning" Myers. *See Bickling v. Kent General Hosp., Inc.,* 872 F.Supp. 1299, 1307 (D.Del.1994).

In an attempt to get around this fatal deficiency, Myers contends that he was slandered by innuendo because once an accusation of sexual abuse has been made, the "parents are automatically suspects." Although this statement may have some currency, it fails to rescue his claim from dismissal, especially since any statements which the doctors made to the police fall within a separate and independent privilege. *Cf. Re v. Horstmann,* 1987 WL 16710, at \*3 (Del.Super.Ct. Aug. 11, 1987) (citing *Prosser & Keeton on Torts* § 114, at 819 (5th ed.1984)).

## V. CONCLUSION.

This case serves as a sad reminder of the devastation which can occur when individuals let themselves be swept up by events. Here, the police were so busy trying to solve a crime, they never stopped to think that one might not have actually been committed. Furthermore, the way in which the officers obtained their first warrant should serve as a shining example for law enforcement everywhere of how *not* to conduct an investigation. While the doc-

tors in this case are not entirely blameless, their mistakes are more understandable, especially given the frenetic pace of an emergency room and the severe trauma these physicians witness every day.

For these reasons, the court has decided to grant partial summary judgment in favor of Myers. Although there is a dispute as to the amount of damages Myers suffered, Officer Gregory shall be held liable for his actions in preparing a warrant application which was so completely lacking in any indicia of probable cause that no reasonable officer would have submitted it for approval or, for that matter, relied on it once it had been approved. For this same reason, Corporal Haug will be held liable for not only his failure to stop the search of Myers' home which was already in progress but also his decision to enter the Myers home and assist in this search. Corporal Slawter and the remaining officers, however, are immune from suit, to the extent that Myers has established a valid claim against them, because they were acting in good faith and in a reasonable manner. Finally, because Myers has failed to introduce competent expert testimony on the negligence of the medical defendants and because these defendants are otherwise immune from suit, the court will grant summary judgment in their favor. The court will issue an order to this effect in conjunction with this opinion.