# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| DWAYNE MILTON AND SHAWNA MILTON, individually and on behalf of Minor B., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | C.A. NO. N21C-05-082 VLM |
| ALFRED I. DUPONT HOSPITAL FOR CHILDREN, NEMOURS FOUNDATION, GINA AMOROSO, D.O., AND LISA JOSEPH, APRN, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION
Submitted: August 1, 2024
Decided: November 1, 2024

*Upon Consideration of Defendants' Motion for Partial Summary Judgment,*
**GRANTED,** *in part*, **DENIED,** *in part.*

Raj Srivatsan, Esquire, of THE IGWE FIRM, Wilmington, Delaware, Attorney for Plaintiffs.

Lindsey E. Imbrogno, Esquire, of BALAGUER, MILEWSKI, & IMBROGNO LLP, Wilmington, Delaware, Attorney for Defendants.

**Medinilla, J.**

# I.    Introduction

In this medical negligence suit, Shawna and Dwayne Milton ("the Miltons" or "Plaintiffs") bring one claim of medical negligence on behalf of their daughter against the Alfred I. duPont Hospital for Children, the Nemours Foundation ("Nemours" or "the Hospital"), Dr. Gina Amoroso ("Dr. Amoroso"), and Lisa Joseph, APRN ("NP Joseph")[1] (collectively, "Defendants").

The Miltons also bring individual claims for defamation and emotional distress related to their child's diagnoses of severe malnutrition and failure to thrive and Defendants' decisions to file reports with the Division of Family Services ("DFS") of the Department of Services for Children, Youth, & their Families ("DSCYF").[2] Alleging these reports were false and defamatory in nature, they seek compensatory and punitive damages.

Defendants move for partial summary judgment under Superior Court Rule 56. First, as mandatory reporters, they argue immunity is afforded under the Child Abuse Prevention Act (CAPA). Second, they argue Plaintiffs fail to establish the necessary elements for defamation. Third, they contend the evidence is insufficient to warrant punitive damages as to all claims. For the reasons below, Defendants' Motion is **GRANTED, *in part,* and DENIED, *in part.***

---

[1] Lisa Kelly (née Lisa Joseph) is identified as Joseph in this ruling.

[2] DFS and DSCYF are used interchangeably in this ruling.

## II.    Factual Background[3]

The Miltons' daughter ("B.M.") was born in August of 2018.[4]  In February 2019, the Miltons contacted Nemours with concerns about her constipation.[5]  The following month, during B.M.'s six-month check-up with NP Joseph, these concerns were reiterated.[6]  In April 2019, Plaintiff Shawna Milton filed an insurance complaint against NP Joseph about her "not practicing patient center[ed]-care."[7] Thereafter, the Miltons left NP Joseph, and Dr. Amoroso became the primary care physician.

In May 2019, the Miltons took B.M. to Nemours due to growth and weight issues as well as constipation and—against the Miltons' wishes—the child was admitted to the hospital.[8]  After the Miltons removed B.M. from the hospital against the recommendation of healthcare providers, a first report was made to DFS on May 9, 2019, by Dr. David Garcia.[9]  The next day, DFS caseworker Andrew Bailey

---

[3] Unless otherwise noted, this Court's recitation is drawn from Plaintiff's Complaint ("Compl.") and all documents the parties incorporated by reference. D.I. 1.

[4] *Id.* ¶ 8.

[5] *Id.* ¶ 9.

[6] *Id.* ¶ 10.

[7] *See* Letter from Defense Counsel Regarding Supplemental Submission, D.I. 332 (hereafter "Defs.' First Suppl. Letter"), Exhibit J.

[8] Compl. ¶ 11.

[9] Defs.' Mot. for Partial Summ. J., D.I. 133 (hereinafter "Mot. for PSJ"), Ex. 3 at 11; *see also* Defs.' First Suppl. Letter. Dr. David Garcia is a Nemours Gastroenterologist. NP Joseph communicated with Dr. Garcia regarding concerns that B.M. was malnourished, and Dr. Garcia then made a DFS report due to the concern of B.M. lack of weight gain over many months.

("Bailey") contacted the Miltons and visited their home as well as B.M.'s daycare facility.[10]

A second report was made online to the DFS Hotline on or about May 15, 2019,[11] by Nemours dietician Lauren Capacete with concerns that B.M. had lost more weight since her discharge.[12]  Approximately three weeks later, Dr. Amoroso made a third report to DFS on June 6, 2019, for concerns related to B.M.'s weight.[13]

On June 10, 2019, a nurse from Children's Hospital of Philadelphia ("CHOP") documented a discussion with the Miltons regarding concerns that CHOP was "complicit" in its request for B.M.'s admission, and despite reassurances that CHOP was exercising independent judgment, the Miltons insisted that B.M. was thriving and would make their decision regarding admission on their own.[14]  Dr. Amoroso was made aware of the situation.[15]

---

[10] Compl. ¶ 12.

[11] Defendants' supplement letter submitted on June 20, 2024, clarifies that the date of the report may have been May 14, 2019. Defs.' First Suppl. Letter.

[12] Mot. for PSJ, Ex. 2 at NEMOURS00257.

[13] *See* Defs.' First Suppl. Letter.

[14] *Id.*, Ex. I. CHOP records indicate that the nurse "spoke with Mother and Father for an hour. They feel they are not being heard by A.I. Dupont and now they feel they are not being heard by CHOP… They believe that constipation is the only diagnoses that need to be addressed.… They disagree with the diagnoses list provided by A.I. Dupont, they now feel that CHOP is complicit due to our admission request.… They believe that Dupont and CHOP are being biased on DFS involvement. I assured the parents that the only judgment I can employ is regarding the diagnoses list and weight gain chart… [The parent] insist that [B.M.] is in fact thriving.  They will make a decision to come to CHOP on their own terms."

[15] *Id.*

4

That same day, Dr. Amoroso informed the Miltons that they needed to have B.M. admitted to the hospital within 24 hours.[16] During this timeframe, at approximately ten months old, B.M. weighed ten pounds.[17]

The next day, on June 11, 2019, at approximately 9 am, Bailey also contacted the Miltons and informed them that B.M.'s condition was dire, and they needed to take B.M. to a hospital immediately.[18] According to Bailey, Plaintiff Shawna Milton told him that she "had not agreed with [Dr. Amoroso] to do that. . . [that] all the doctor appointments had become a financial burden. . . and [they] wanted to seek a third opinion."[19] Bailey informed her that "if she did not admit [B.M.], DFS would move forward and take custody."[20] Plaintiff further responded that "she was going to speak to her lawyer."[21] At approximately 6 pm that evening, the Miltons took their daughter to CHOP.[22]

On that same day, before B.M.'s admission to CHOP, two additional reports had been made to DFS after the Miltons failed to attend a scheduled appointment at

---

[16] Compl. ¶ 13-14.

[17] Mot. for PSJ at 1.

[18] *Id.*, Ex. 3 ("Family Court Tr.") at 16.

[19] *Id.*

[20] *Id.*

[21] *Id.* at 17.

[22] Mot. for PSJ at 3.

Nemours.[23]  The last report filed with the DFS hotline stated that the child was at risk of death.[24]  DFS then filed an *ex parte* petition with the Family Court of Delaware that granted it temporary custody of B.M.[25]

On June 12, 2019, CHOP confirmed, "[w]e agree that [B.M.] is at significant risk, given her malnutrition.  We agree that [B.M.] needs to be inpatient….  This is definitely not constipation alone.  We are available to admit to CHOP if necessary.  Parents would have to agree.  [DFS] may need to take responsibility for this infant."[26]

CHOP diagnosed B.M. with severe malnutrition and confirmed she was "at increased risk for refeeding syndrome[27]."[28]  B.M. was admitted for failure to thrive.  After ten days, she was discharged successfully after she was given glycerin suppositories and gained weight on full caloric oral and NG feedings.[29]  The Family

---

[23] *Id.* at 2. On or about June 11, 2019, Dr. Amoroso made a report to DFS that B.M.'s situation was critical and needed to be hospitalized.  *See also* Defs.' First Suppl. Letter, Ex. F (6/11/2019 Social Work Progress Note by Jennifer Macaulay "A new report has been made to the DE Child Abuse Hotline due to the no-show visit to feeding therapy today.").

[24] *Id.*

[25] Compl. ¶ 17-18.

[26] Defs.' First Suppl. Letter, Ex. I.

[27] Refeeding syndrome can happen when somebody who is malnourished begins feeding again. *Refeeding Syndrome*, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/diseases/23228-refeeding-syndrome (last updated June 6, 2022).  Complications from refeeding syndrome can lead to death, but once healthcare corrects the imbalances involved, most symptoms are reversible. *Id.*

[28] Mot. for PSJ, Ex. 12 at 354.

[29] *See id.* at 349; D.I. 341, Ex. 8 MILTON 0532.

Court ordered B.M. to remain in the custody of DFS on June 19, 2019,[30] and she remained in custody until September 2019.[31]

### III.        Procedural Background

The Miltons filed a Complaint initially asserting six counts—Count I (Defamation), Count II (IIED), Count III (RIED), Count IV (NIED), Count V (Medical Negligence), and Count VI (Respondeat Superior Against Defendant Nemours).[32]  Plaintiffs voluntarily dismissed the NIED claim.[33]

Defendants moved for partial summary judgment under the immunity provisions found in the Child Abuse Prevention Act ("CAPA") of 16 *Del. C.* §908(a),[34] as well as other grounds related to the emotional distress claims; namely lack of expert testimony.[35]  Following oral arguments on March 11, 2024, and a bench ruling hearing on May 30, 2024, this Court granted partial summary judgment in favor of Defendants on both the IIED and RIED claims.[36]

---

[30] Compl. ¶ 19.

[31] *Id.* ¶ 22.

[32] *Id.* at 5-10.

[33] *See* D.I. 237.

[34] Mot. for PSJ at 5-6.

[35] *Id.* at 8-9.

[36] *See* D.I. 280. On June 5, 2024, Plaintiffs filed a Motion for Reargument on the Court's dismissal of Count II, the IIED claim. D.I. 281. Plaintiffs' counsel further requested leave to file for interlocutory review if this Court ruled against Plaintiffs. *See id.* Defendants filed their opposition on June 12, 2024. D.I. 325. Because the supplemental filings may have had some bearing on the

The Court requested supplemental information from both parties regarding their respective positions under CAPA, additional evidence related to the defamation claim, and Plaintiffs' basis for seeking punitive damages.[37] The parties filed various submissions.[38]

Eleven days before trial was scheduled to begin on July 22, 2024, Plaintiffs requested a continuance and to re-open discovery—to "potentially moot" the pending motions for summary judgment.[39] On July 19, 2024, this Court granted Plaintiffs' request for a trial continuance but denied Plaintiffs' request to reopen discovery.[40] A transcript request was made on August 1, 2024.[41] With no additional submissions having been filed, the remaining issues are now ripe for consideration.

## IV.     Party Contentions

The Miltons first bring a medical negligence claim on behalf of B.M.,[42] asserting Defendants deviated from the standard of care in evaluating and managing

---

Motion for Reargument, the Court took the matter under advisement pending its review of those filings. The Court denied reargument on October 17, 2024. D.I. 410.

[37] Tr. of Mot. Hr'g held on Thursday, May 30, 2024 at 51-52, D.I. 409 (hereinafter "Tr.").

[38] *See* D.I. 332-357.

[39] D.I. 402, 404. Plaintiffs' counsel indicated an intent to "seek reopening of discovery," and asked leave to "permit supplemental briefing, if necessary, to demonstrate the areas of discovery required, now that time is not an issue which renders some of the arguments made in the seven pending briefings potentially moot." D.I. 402 at 1.

[40] D.I. 408.

[41] Tr.

[42] The medical negligence claim is not before this Court on this Motion.

B.M.'s constipation promptly to investigate and manage the issue.[43]  Namely that Defendants' emphasis on feeding and weight gain delayed the diagnosis of fecal impaction and the performance of a disimpaction, as properly addressed by CHOP.[44]

These alleged failures, they say, give rise to their individual claims for defamation, emotional distress, and punitive damages.[45]  Specifically, that what started as alleged misdiagnoses of the child's severe malnutrition and failure to thrive resulted in Defendants' actions of reporting the Miltons to DFS.[46]  They claim that Defendants' focus on malnutrition alone, while ignoring the underlying constipation problem, led to a series of false reports to DFS and defamatory statements to CHOP.[47]

Defendants first turn to the immunity provisions found in the Child Abuse Prevention Act ("CAPA") of 16 *Del. C.* §908(a).[48]  They argue Plaintiffs cannot establish willful or wanton misconduct to overcome the presumption of good faith by clear and convincing evidence where any reporting to DFS and communications to CHOP were based on legitimate medical concerns about B.M.'s health and well-

---

[43] Mot. for PSJ, Ex. 13; D.I. 183, Ex. A. at 2 (hereafter "Report of Pls.' Standard of Care Expert").

[44] Report of Pls.' Standard of Care Expert at 2.

[45] Compl. at 9-10.

[46] *See id.* at 5-6; *see also* Resp. to Partial Mot. to Summ., D.I. 139 at 1-2 (hereafter "Pls.' Resp.").

[47] *See* Pls.' Resp. at 8-9.

[48] Mot. for PSJ at 5-6.

being.[49]  Defendants further argue that even if CAPA was inapplicable, Plaintiffs fail to establish all necessary elements for defamation as a matter of law.[50]  They assert no evidence exists to warrant punitive damages as to all claims.[51]

Plaintiffs respond that immunity is not applicable where Defendants acted with malice and willful misconduct in their treatment of B.M. and in making these reports to DFS.[52]

The Court now determines whether the remaining issues of defamation and punitive damages warrant summary judgment.

## V.     Standard of Review

The burden of proof on a motion for summary judgment under Superior Court Civil Rule 56 falls on the moving party to demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[53]  If the moving party satisfies its initial burden, the non-moving party must sufficiently establish the "existence of one or more genuine issues of material fact."[54]  Summary judgment will not be granted if there is a material fact in dispute

---

[49] *Id.*

[50] *Id.* at 6-9.

[51] *Id.* at 9-10.

[52] *See* Pls.' Resp. at 2.

[53] Super. Ct. Civ. R. 56(c).

[54] *Quality Elec. Co., Inc. v. E. States Const. Serv., Inc.*, 663 A.2d 488, 1995 WL 379125, at *3–4 (Del. 1995); *see also Moore v. Sizemore*, 405 A.2d 679, 681 (Del. 1979).

or if "it seems desirable to inquire thoroughly into [the facts] in order to clarify the application of the law to the circumstances."[55] "All facts and reasonable inferences must be considered in a light most favorable to the non-moving party."[56] However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury reasonably could find for the plaintiff."[57]

## VI.     DISCUSSION

### A. DEFAMATION

To establish a *prima facie* case for defamation, the plaintiffs must provide evidence of: (1) a defamatory communication; (2) publication; (3) reference to the plaintiff; (4) the third party's understanding of the communication's defamatory character; and (5) injury.[58] "[T]he defamation plaintiff, as the party bearing the burden of proof at trial, must introduce evidence creating a genuine issue of material fact for all elements of a defamation claim."[59]

---

[55] *Ebersole v. Lowengrub*, 180 A.2d 467, 469–70 (Del. 1962). *See also CNH Indus. Am. LLC v. Am. Cas. Co. of Reading*, 2015 WL 3863225, at *1 (Del. Super. June 8, 2015).

[56] *Nutt v. A.C. & S. Co., Inc.*, 517 A.2d 690, 692 (Del. Super. 1986) (citing *Mechell v. Plamer*, 343 A.2d 620, 621 (Del. 1975); *Allstate Auto Leasing Co. v. Caldwell*, 394 A.2d 748, 752 (Del. Super. 1978)).

[57] *Smiley v. Taylor*, 2008 WL 5206811, at *2 (Del. Super. Dec. 10, 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

[58] *See Esposito v. Townsend*, 2013 WL 493321, at *7 (Del. Super. Feb. 8, 2013).

[59] *Doe v. Cahill*, 884 A.2d 451, 463 (Del. 2005).

The initial defamation claims brought here allege Defendants falsely reported Plaintiffs were noncompliant with treatment recommendations and were refusing to provide medical treatment to [B.M.]."[60]  In the Complaint, Plaintiffs further alleged the Family Court "issued an Order defaming Plaintiffs and finding that Probable Cause existed that [B.S.] continued to be in actual physical, mental or emotional danger, was at substantial imminent risk of physical, mental, or emotional danger, or had been abused or neglected as defined by 10 *Del. C.* § 901(1) and (18)."[61]  At the outset, this Court does not consider the allegations that the Family Court "defamed" Plaintiffs.[62]

During oral arguments and in response to Defendants' Motion for Partial Summary Judgment, Plaintiffs now also argue that defamatory statements were made to CHOP when B.M. was admitted for treatment.[63]  For the following reasons, summary judgment as to the defamation claims must be granted.

---

[60] Compl. ¶ 25.

[61] *Id.* ¶ 28.

[62] These claims are against Defendants, not the Family Court.  There is no evidence that Defendants made any statements to the Family Court and any information that gave rise to that Court's determination was based upon information from DFS, tasked with investigating child welfare concerns.

[63] During the hearing on May 30, 2024, Plaintiffs argued defamatory statements were made to CHOP. Tr. at 41-42.

**1. DEFENDANTS ARE MANDATORY REPORTERS IMMUNE UNDER CAPA**

Established in 1983, the Department of Services for Children, Youth & Their Families (DSCYF) is "The Children's Department" primarily responsible for providing and managing services for children who have experienced abandonment, abuse, adjudication, mental illness, neglect or substance abuse.[64] The Division of Family Services (DFS) is a division of DSCYF charged with ensuring the welfare of children.[65] DFS's mission, in part, is to promote the safety and well-being of children through prevention and protection.[66]

DFS's investigative role and Delaware's' mandatory reporting laws are found generally in the Child Abuse Prevention Act ("CAPA") under Chapter 9 of Title 16.[67]

---

[64] *About the Department*, DELAWARE.GOV, https://kids.delaware.gov/about/ (last visited Oct. 29, 2024).

[65] *Division of Family Services*, DELAWARE.GOV, https://kids.delaware.gov/family-services/ (last visited Oct. 29, 2024).

[66] *See* DFS's Mission Statement. *Id.*

[67] 16 *Del. C.* § 901 provides in part,

> "The child welfare policy of this State shall serve to advance the best interests and secure the safety of the child, while preserving the family unit whenever the safety of the child is not jeopardized. . . .  To that end this chapter, among other things, does all of the following:
>
> (1) Provides for comprehensive, multidisciplinary investigative and protective services for abused and neglected children.
>
> (2) Mandates that reports of child abuse or neglect be made to the appropriate authorities…."

CAPA mandates reporting under 16 *Del. C.* § 903.[68]  This law was adopted for the "express purpose of 'ensur[ing] the best interest and safety of the child. . ..'"[69]

CAPA also provides immunity from liability to persons who report suspected child abuse or neglect in good faith.[70]  The standard for immunity under CAPA is not whether the report was accurate, but whether it was made in good faith based on a reasonable suspicion of neglect or abuse.[71]  Good faith is "presumed in the absence of evidence of malice or willful misconduct."[72]  The burden thus falls on Plaintiffs to overcome this presumption with clear and convincing evidence to the contrary.

Here, numerous reports were made to DFS by various medical providers. These reports, therefore, were presumably made in good faith based on individualized concerns about B.M.'s weight gain and nutritional status.  Plaintiffs

---

[68] "Any person, agency, organization or entity who knows or in good faith suspects child abuse or neglect *shall* make a report in accordance with § 904 of this title." 16 *Del. C.* § 903 (emphasis added).

[69] *Myers v. Med. Ctr. of Delaware, Inc.*, 86 F. Supp. 2d 389, 412 (D. Del. 2000).

[70] *See* 16 *Del. C.* § 908.

[71] *See Myers*, 86 F. Supp. 2d, 412. The purpose of the statute is to encourage providers to "come forward when they suspect possible child abuse." *See also Hedrick v. Quest Diagnostics Clinical Lab, Inc.*, 807 A.2d 584, 593 (Del. Super. 2002) ("A primary intent of this or similar immunity provisions is to encourage the reporting of child abuse and not place an undue chill on the willingness to do so.")

[72] 16 *Del. C.* § 902(15).

14

argue they can rebut the good faith presumption and establish bad faith as to all Defendants.[73]

In support, they first turn to an insurance complaint filed regarding Defendant NP Joseph.[74] Plaintiffs contend that NP Joseph's report to DFS was retaliatory in nature and in bad faith because she reported to DFS following the receipt of this insurance complaint.[75] It is true that an insurance complaint was made by Plaintiffs to the insurance company, and it notified NP Joseph in a letter dated April 30, 2019.[76] It also appears that she received an email informing her of the insurance complaint one week prior.[77] Plaintiffs allege that she either communicated the complaint to Dr. Garcia, who retaliated and made the first report,[78] or that upon learning that a complaint has been filed against her, she retaliated and reported.[79]

The evidence of an insurance letter sent to NP Joseph does not establish that she made the report in bad faith. When asked in her deposition:

Q.     Why did you call DFS?

---

[73] *See* Letter Mem. on Denial of Immunity for Bad Faith, D.I. 341 (hereafter "Pls.' Letter on Bad Faith").

[74] See Defs.' First Suppl. Letter, Exhibit J.

[75] *See* Pls.' Letter on Bad Faith at 1-2.

[76] See Defs.' First Suppl. Letter, Exhibit J.

[77] *Id.*

[78] Defs.' First Suppl. Letter.

[79] *Id.*

15

A.    At the time of the DFS call, I was still listed as the PCP. And so with a second hospitalization that was planned, and continued to not follow through with the plans in the hospital and the concerns for [B.M.] continued at this point, still not gaining any weight, at that point, I was concerned for her safety.[80]

****

Q.    It's your plan, not the plan they wanted. They had rejected you flat out, out of hand, and wrote to the insurance company. They wanted nothing to do with you. And yet you persist in insisting that you are still their PCP, on some figment of imagination that you are still their PCP, ma'am. And did you have any authority to call DFS when you were not her PCP?

A.    Yes.

Q.    You had authority to call the DFS?

A.    Yes.

Q.    On what basis?

A.    I'm a mandated reporter. I had concerns, absolutely. And at the time I called, I was still functioning as her PCP. I had not been notified that I was not.[81]

As a mandatory reporter, NP Joseph had an obligation to report. To the extent there is any correlation to the insurance complaint, Plaintiffs fail to present any retaliatory reason that establishes malice or willful misconduct. The deposition testimony of NP Joseph indicates uncertainty about whether she personally made a DFS report or if it was Dr. Garcia who did so after their discussion.[82] And regardless of whether either was aware of the insurance complaint, there is no clear evidence

---

[80] D.I. 343, Ex. 2 at 205. *See* Defs.' First Suppl. Letter.

[81] Defs.' First Suppl. Letter.

[82] *Id.*; D.I. 379 (hereafter "Defs.' Second Suppl. Letter").

16

that this knowledge directly influenced the reports to DFS. Nor does it negate the fact that the child was in a medically dire situation.

Even if there was a genuine issue of material fact as to whether the first report was retaliatory in nature, Plaintiffs point to no evidence to suggest that other individuals who made subsequent DFS reports (Dr. Amoroso, Lauren Cohen, and Jennifer Macaulay) had any knowledge of the insurance complaint. Rather, it was the declination of the child's medical condition that obligated the reporting to DFS and necessitated DFS involvement. Thus, NP Joseph is presumed to have acted in good faith. Plaintiffs fail to rebut the presumption.

Plaintiffs also assert Dr. Amoroso acted in bad faith and falsified her report to DFS "knowing there was no cardiac/refeeding danger or death of child from it."[83] In support, they include Dr. Amoroso's testimony where she was in communications with the Miltons to see them later in the week to suggest the child was not in grave danger as reported. Yet, she explained why she made the call to DFS:

> Q.     So on 6/11…what did you tell DFS?
>
> A.     . . . .I spoke that after much reviewing the chart, reviewing medical literature, seeing her on the 6th, speaking with CHOP, that an admission was essential for her health and her safety. . . . and I told [Mom] I needed an admission on the 11th and I told [Bailey] if she wasn't admitted –and I shared with [Mom] as well—I was going to have the next step, and I will share with you that I had to make that phone call. I had to. The only other option is getting a phone call that

---

[83] Pls.' Letter on Bad Faith at 1.

something happened to B.M. And that phone call ensured the admission, her health. . . . [I] had to do what I had to do.[84]

Dr. Amoroso's concern for the gravity of B.M.'s medical condition is consistent with CHOP's admission note that B.M. was "severely malnourished and at increased risk for refeeding syndrome."[85] When B.M. presented to CHOP at approximately ten months of age, she weighed only ten pounds. Those CHOP records also concur with Defendants' ongoing concerns and a need for admission. "We agree that [B.M.] is at significant risk, given her malnutrition. We agree that [B.M.] needs to be inpatient. . . . This is definitely not constipation alone. We are available to admit to CHOP if necessary. . . ."[86]

Both hospitals memorialized difficulties accessing B.M. for treatment. Nemours documented general concerns regarding the Miltons' comprehension of the severity of the situation and the need for follow-up.[87] CHOP memorialized similar

---

[84] *Id.*, Ex. 5 at 255-256.

[85] Mot. for PSJ, Ex. 12 at 354.

[86] Defs.' First Suppl. Letter, Ex. I.

[87] One Nemours report notes, "[v]oiced concerns regarding family's comprehension of severity of malnutrition." Another states, "[m]om refused labs, mom was directed to feed every 3 hours with 1 ounce of formula with no weight gain in 24 hours, then she was discharged on the condition that the baby be seen with PCP within a week. [B.M.] is now scheduled at Jessup St office as a transfer on 5/21 for 'slow weight gain.' No appts scheduled within the week as advised." Yet another report indicates, "[m]other and father refused to stay for further evaluation of patient despite GI and Dietary's education." Defs.' First Suppl. Letter, Ex. F.

18

issues and the Miltons' reluctance regarding hospital admission.[88]  In an audio file with DFS representative Bailey, Shawna Milton indicated:

> "… So in the event that we lose our jobs, then who's gonna provide for our family?  *We do not have time to continue to keep taking time off for unjust admissions*…."[89]

During her conversation with a CHOP social worker, she expressed a similar averseness to inpatient treatment:

> [CHOP social worker] – [B]ecause you guys left against medical advice at DuPont?
>
> SHAWNA MILTON: Right.  So they admitted us under the false pretenses that they were going to review her internal system because we had the GI concern.  Well, what we didn't know was they preauthorized care under an NG tube…. *So, naturally, yes, we took her out because testing was done, there was nothing medically wrong with her*.  So you're not going to bring us in, charging up our insurance, uprooting our family life for something that we didn't agree to.  There was no treatment plan. *We didn't talk about an NG tube.  It wasn't medically necessary, so, yes, we took her out*."[90]

---

[88] One CHOP record notes "I spoke with Mother and Father for an hour. They feel they are not being heard by A.I. Dupont and now they feel they are not being heard by CHOP… They believe that constipation is the only diagnoses that need to be addressed.…  They disagree with the diagnoses list provided by A.I. Dupont, they now feel that CHOP is complicit due to our admission request….  [The parent] insist that [B.M.] is in fact thriving.  They will make a decision to come to CHOP on their own terms." Defs.' First Suppl. Letter, Ex. I. Another CHOP report notes "[w]e agree that [B.M.] needs to be inpatient. . . . This is definitely not constipation alone.  We are available to admit to CHOP if necessary.  Parents would have to agree.  [DFS] may need to take responsibility for this infant." *Id.*

[89] Mot. for PSJ, Ex. 5 at 8.

[90] Mot. for PSJ, Ex. 4 at 2-3.

Not only did CHOP's treatment plan include NG feedings,[91] their records reflect the diagnoses were complex and involved fluid/caloric deficiencies that may have contributed to the constipation.[92] But the question here is not whether Defendants failed to properly treat or diagnose B.M. Instead, the question is whether Plaintiffs can rebut the presumption of good faith.

There is no indication that these providers used the reporting system for purposes other than for which it was designed; to protect the child. It is not for this Court to undo the intent of CAPA or "discourage the reporting of suspected child abuse by exposing either mandatory or voluntary reporters to the significant risk of civil liability."[93] To do so runs counter to the mandatory reporting statute. The law imposes a duty on certain named professionals to report suspected child abuse. They did so here.

As mandatory reporters, they are presumed to have acted in good faith. Plaintiffs fail to establish clear and convincing evidence of malice or willful misconduct by Defendants in reporting their concerns to DFS. Therefore, there is insufficient evidence to overcome this presumed good faith under CAPA. Given the

---

[91] Ex.9 at 459, D.I. 350.

[92] *Id.*

[93] *Wolf v. Fauquier Cnty. Bd. of Supervisors*, 555 F.3d 311, 319 (4th Cir. 2009).

lack of specific evidence demonstrating bad faith, Defendants are entitled to immunity.

### 2. PLAINTIFFS FAIL TO ESTABLISH DEFAMATORY STATEMENTS

In addition to defamation allegations that stemmed from DFS reporting, Plaintiffs shift to a new theory of liability. On May 30, 2024, during the bench ruling where summary judgment was granted on the emotional distress claims and the Court raised issues related to immunity, Plaintiffs' counsel first introduced the theory that alleged defamatory statements extended to CHOP.[94]

In deciding whether a statement is defamatory, the Court must consider if the alleged defamatory statements are statements of facts or opinions and whether such statements are capable of defamatory meaning.[95] This is a question of law.[96] But first there must be a statement.

Despite this Court's request for supplemental evidence in support, Plaintiffs fail to produce what statements were allegedly made, by whom, or when.[97] Plaintiffs point to hospital medical records and Plaintiff Shawna Milton's journal. Yet, the

---

[94] Tr. at 41-42.

[95] *See Doe*, 884 A.2d at 463; *see also Wallace v. Geckosystems Int'l Corp.*, 2013 WL 4054147, at *4 (Del. Super. July 31, 2014).

[96] *Wallace*, 2013 WL 4054147, at *3 (citing *Riley v. Moyed*, 529 A.2d 248, 251 (Del. 1987)).

[97] *Id.* at 60 (the Court asked "I am trying to understand the basis for the claim of defamation, and the third party here is CHOP. And what was the publication? What was the defamatory communication? [Plaintiffs' counsel] is going to get me that information.").

specific content of these alleged communications remains unclear.[98]  Plaintiffs

contend that defamation can be imputed from these medical records and the journal

that purportedly records that one CHOP provider ". . . apologized for getting a wrong

picture about Plaintiffs from Nemours documents."[99]

At the outset, the reason for the CHOP nurse's alleged apology, if any, is

unknown.  Plaintiffs argue that a jury could infer that the apology was the result of

defamatory statements made by Defendants to CHOP that tainted CHOP's

perception of the Miltons.  Aside from the fact that the source of the alleged apology

is self-serving, this argument is too attenuated.

Citing again to the insurance complaint against NP Joseph,[100] Plaintiffs

suggest this may have motivated defamatory statements to CHOP.[101]  This, too, is

without merit.  The record reflects that Dr. Amoroso (and maybe Lauren Cohen)

---

[98] The examples provided by the Plaintiffs included a report sent by CHOP to Nemours dated 6/11/2019 that states "parents continued to have difficulty recognizing the seriousness of [B.M.]'s condition." Ex. A, D.I. 360. Plaintiffs assert that the basis of this statement was provided by Nemours, which paints Plaintiffs in a defamatory light. *Id.*  Another example is a report from CHOP that states "…[DFS] involved for concern that parents did not take situation seriously." Ex. B, D.I. 361. Plaintiffs argue this is defamatory because it falsely implies that parents were negligent about B.M.'s health and situation. Plaintiffs also point to a note in the CHOP documents that states "there is currently an order of protective custody for [B.M.] with Delaware DSCYF because of her parents['] management of her failure to thrive." Letter on Defamation Claim, D.I. 357 (hereinafter "Pls.' Letter on Defamation"). Plaintiffs also provide Shawna Milton's journal, where she claims a nurse "apologized for the perception of the family" per the documents from Nemours.  Ex. C, D.I. 362.

[99] Pls.' Letter on Defamation.

[100] *Id.*; Pls.' Letter on Bad Faith.

[101] Tr. at 28.

22

communicated with CHOP. [102] There is no evidence, however, that they had knowledge of the insurance complaint when they communicated with CHOP.[103]

Thus, the Court cannot determine what alleged defamatory statements were made. Nor can it decide whether any alleged statement was fact or opinion. Without any specifics, one would be required to 1) assume that a statement was made in the first place; 2) find that the source came from one of the Defendants; 3) find that the statement was, in fact, defamatory; and 4) find that the defamatory statement yielded the representations in the medical records and the alleged apology. Even considering all facts and reasonable inferences in a light most favorable to the Miltons, the "mere existence of a scintilla of evidence" is insufficient from which a jury could reasonably find for the plaintiff.[104] Because there is insufficient evidence to establish a *prima facie* case of a defamatory statement made to CHOP, the inquiry stops here. Summary judgment must be entered on the defamation claim.

## B. PUNITIVE DAMAGES

Plaintiffs also seek punitive damages against individual defendants and Nemours under the principle of *respondeat superior*.[105] Defendants argue there is

---

[102] Defense Counsel provided a corrected Letter to the Court expressing that Lauren Cohen possibly had communications with CHOP. Defs.' Second Suppl. Letter.

[103] *See id.*; Defs.' First Suppl. Letter.

[104] *Smiley*, 2008 WL 5206811, at *2.

[105] Compl. at 9-10.

no evidence to support punitive damages as to *any* claims.[106]  It is true that the issue of punitive damages was tethered to the defamation and emotional distress claims that have now been summarily decided.  But the medical malpractice and *respondeat superior* claims are not the subject of this motion.[107]

The issue of whether punitive damages are warranted will fall or rise with the medical negligence claim.  Since a review of the medical negligence claim is not before this Court, the Court must deny summary judgment at this juncture.

## VII.    CONCLUSION

Defendants' Motion for Partial Summary Judgment as to the defamation claim is **GRANTED.**   The medical negligence and *respondeat superior* claims will proceed to trial.  Accordingly, at this juncture, the Motion for Summary Judgment for punitive damages is **DENIED.**

**IT IS SO ORDERED.**

*/s/ Vivian L. Medinilla*
Vivian L. Medinilla
Judge

---

[106] Mot. for PSJ at 10.

[107] Tr. at 22.